## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 3:03CR129(JCH)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **ROGER BENNETT** | : | **AUGUST 29, 2005** |

### SENTENCING MEMORANDUM OF ROGER BENNETT

This Sentencing Memorandum is respectfully submitted on behalf of Roger Bennett, who is scheduled to be sentenced on Tuesday, August 30, 2005 at 3:45 p.m. Mr. Bennett waived indictment and entered into a plea and cooperation agreement with the Government in 2003. Mr. Bennett has fully accepted responsibility, and feels deep remorse and embarrassment, for his criminal offense. Since Mr. Bennett was informed in late 2002 that he was a target of the Government's investigation, Mr. Bennett faced up to his wrongdoing, and has done all in his power to cooperate fully with the Government in the investigation and prosecution of Kurt Claywell. As is discussed more fully below, we trust and hope that the Court will recognize that Mr. Bennett, despite his commission of the offense in this matter, is a fundamentally good, decent man who has the potential to continue to be a constructive and contributing member of society. For the reasons set forth below, we respectfully request that the Court impose a sentence of probation in this matter. We respectfully submit that such a sentence, under the totality of the circumstances, would be a sentence sufficient, but not greater than necessary, to achieve just punishment in this instance.

## I.    PROCEDURAL BACKGROUND

On May 13, 2003, Mr. Bennett appeared before this Court, waived indictment, and entered into a plea agreement and cooperation agreement with the Government.  Mr. Bennett pleaded guilty to a conspiracy with respect to an IRS employment tax audit of Claywell Electric Co. and Claywell Inc. that was being conducted in 1998.  During the course of the audit, Mr. Bennett gave documents to the IRS auditor with the knowledge that Claywell had either altered or fabricated the documentation.  While it was Claywell who decided to alter or fabricate the documentation, Mr. Bennett did provide information to assist Claywell in creating falsified computer printouts, and presented to the auditor documentation and printouts that he was aware had been altered or fabricated.  As a result, Claywell avoided payment approximately $10,500 of employment taxes.  Mr. Bennett did not receive any financial gain from assisting Claywell in this unlawful conduct.

## II.    UPDATED INFORMATION

Mr. Bennett was originally scheduled to be sentenced in July of 2003.  However, due to his cooperation with the Government, including the potential that Mr. Bennett might be needed by the Government at a contested sentencing hearing at the sentencing of Kurt Claywell, motions to postpone Mr. Bennett's sentencing were made so that Mr. Bennett's sentencing would occur after Claywell's sentencing.  More recently, a motion for postponement of Mr. Bennett's sentencing was made based upon counsel's family medical circumstances.  Given that a significant amount of time has passed since the original sentencing date and the PreSentence

Report, U.S. Probation Officer Raymond Lopez indicated to counsel that Mr. Bennett's

Sentencing Memorandum should provide the Court with updated information.

Since Mr. Bennett's guilty plea in 2003, the partnership that was Bennett & Katz has

dissolved. Thereafter, Mr. Bennett set up his own business in Bloomfield, Connecticut called

Bennett & Co. Notwithstanding Mr. Bennett's offense, and in a remarkable demonstration of

loyalty that is a testament to Mr. Bennett, all but three of his clients from Bennett& Katz stayed

with Mr. Bennett as he created Bennett & Co. Thus, approximately three hundred personal

(1040) clients and fifty business clients decided to remain with Mr. Bennett as their accountant.

Mr. Bennett is still a CPA, and his license has not yet been acted on as a result of this

proceeding. Mr. Bennett is in danger of losing his CPA license, although Mr. Bennett hopes to

present the nature and extent of his cooperation with the Government as a mitigating factor, as

well as the fact that his conduct did not involve client risk.

In the past two years, Bennett & Co has grown to support six employees. Compared with

Bennett & Katz, Mr. Bennett's pre-tax profit at Bennett & Co. has decreased, given that there is

increased overhead borne by Mr. Bennett, as well as the natural maturation of business clients

which causes them to seek out the services of larger CPA firms.

As to Mr. Bennett's financial condition, given the passage of time, and adjusting on the

basis of corrections and changes, Mr. Bennett's current net worth would be reflected as

approximately $575,000. A significant amount of the increase in net worth is attributable to Mr.

Bennett's estimate of the increase over the last few years of the fair market value of real estate

that Mr. Bennett then owned and continues to own (his home in West Hartford and the

condominium in which his mother lives in Springfield, Massachusetts).

With respect to Mr. Bennett's physical condition, his ankylosing spondolitus, an arthritis-like condition in joints that is marked by fusing of joints that Mr. Bennett has had since he was 19 year old, has worsened in the last few years. Taking Celebrex for this condition has been replaced by Mr. Bennett having to give himself a weekly injection of Enbrel (etanercept).

Mr. Bennett and his wife, Barbara, continue to reside at 1 Arlen Way in West Hartford, with their three children, daughters Jamie, age 14, and Alison, age 12, and son Michael, age 8.


III.     PERSONAL BACKGROUND

Roger Bennett was born in Springfield, Massachusetts on August 12, 1955. His father, Nathan Bennett, was 39 year old when Roger was born. Nathan had married Roger's mother, Evelyn, five years earlier when she was 23 years old. Roger's only sister, Lisa, was born in 1952.

Roger's father had his own building wrecking company. The business had its share of financial difficulties, and Roger's father worked six days a week. Roger's mother was the caretaker for the children and did not work outside of the home. Both of Roger's parents were reserved and emotionally distant.

When Roger was a sophomore in high school, Nathan Bennett died of a heart attack at age 55. Roger was devastated by his father's death, but only recently, through therapy, has realized the extent to which that loss remained unresolved within him and influenced his actions in his life. Roger certainly felt adrift, like on a boat with no captain. Nevertheless, with his mother now highly dependent on him, Roger persevered. He graduated high school, and then graduated from the University of Massachusetts at Amherst with a degree in accounting. Because of his mother's need to have him close, Roger working in the accounting field in the

greater Hartford area. In June of 1988, Roger Bennett and Howard Katz formed Bennett & Katz, which had, over time, offices in Hartford, Rocky Hill, Manchester and finally West Hartford.

In 1987, Roger Bennett met Barbara Schwarz, whom he married in 1989. They have three children, Jamie, Alison, and Michael, who have no knowledge concerning Mr. Bennett's offense. Mrs. Bennett remains fully supportive of Mr. Bennett.

While at Bennett & Katz, in approximately 1996, Mr. Bennett began working for Kurt Claywell, first in a limited capacity, and then for a greater breadth of Claywell's personal and corporate returns. Although not that much older than Mr. Bennett, Claywell appeared to Mr. Bennett to be a successful businessman, who knew a lot about everything and who seemed to take a liking to him. Claywell appeared to have great self confidence and gave Roger the impression that he had taken Roger under his wing. This played directly into Roger's life-long need for a father figure that had emerged in Roger from the death of his father. Claywell took on a role that fulfilled a need that Roger had deep inside.

Although Mr. Bennett did not at the time see it as manipulative, Claywell certainly manipulated Roger throughout their relationship. When ever Roger went to Claywell's business to work, Claywell would invite Roger into his office for a friendly discussion. Claywell made Roger feel that he was more than Claywell's accountant and that Roger meant something to Claywell as a person. Claywell continued to appear very friendly to Roger, and would often make remarks about how Claywell and his wife would have Roger and his wife over for dinner. At other times, Claywell would tell Roger that the Claywells intended to have Roger and his wife and children up to their lake house. Notwithstanding Claywell's numerous statements about proposed socializing with the Claywells, Roger and his wife and family never actually received

5

an invitation to do so. But Claywell always left Roger thinking that Claywell was just too busy at the moment and that that socializing with the Claywells was going to happen.

Subsequent to beginning his cooperation with the Government, Mr. Bennett, through individual counseling, has come to see that the death of his father when Roger was only 16 had left a great void within, and was something with which Roger had never dealt. Indeed, it had been to the point where Roger could not speak his father's name and would leave the room if the conversation among family members turned to the subject of his father. However, in the past two years, Roger has made great strides in therapy and has come to see his vulnerabilities and how they affected his decision to assist Claywell in illegal conduct for which Mr. Bennett received no economic benefit.

Indeed, the hourly fees that Mr. Bennett charged Claywell were the same fees he would have earned had he been working for another client, and Claywell was not a significant percentage of the revenues of Bennett & Katz (1%-2%). Indeed, Bennett & Katz was turning away business and could have replaced the Claywell business with other business at the same hourly rate. Mr. Bennett never received any portion of Claywell's gain from illegal activity, and assisted Claywell without any motive of pecuniary gain.

Mr. Bennett's participation with Claywell in criminal conduct is wholly unlike the conduct he has engaged in throughout his business life and in his personal life. He has been a devoted father and husband. From 1997 to 2000, Mr. Bennett served as a Member of the Board of the Anti-Defamation League, with the goal of promoting racial and religious tolerance and embracing and respecting ethnic diversity. Mr. Bennett also served on the Board of the Chabad House, which, among other things, runs a summer camp, and provides financial support so that

6

people who cannot afford the dues can worship at temple, and so that people who could not afford summer camp would have a camp for their children to attend.

Mr. Bennett had also been very giving of his time to his children and the children of West Hartford. For years, Mr. Bennett has donated his time as coach for soccer, baseball and basketball teams within the various youth athletic programs in West Hartford.

## IV.    SENTENCING GUIDELINES

While the United States Sentencing Guidelines are now advisory rather than mandatory, the Second Circuit has made it clear that the Court must apply the sentencing Guidelines, perform the necessary calculations, and arrive at a sentencing guidelines range. *United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005). Thereafter, and before deciding what sentence to impose, the court looks to the factors set forth in 18 U.S.C. 3553(a), including that the "court shall impose a sentence sufficient, not greater than necessary, to comply with the purposes" of imposing sentence as thy are described in 3553(a). This sentencing memorandum is respectfully submitted to set forth on behalf of Mr. Bennett the application of the sentencing guidelines to this matter, the bases for a downward departure from the resulting sentencing guideline ranges, as well as the application of the 3553(a) considerations to this case.

### A.    Guidelines Calculation

In the plea agreement, the Government and Mr. Bennett agreed that the applicable Sentencing Guideline range for imprisonment should be calculated using the Sentencing Guideline Manual in effect through October 31, 1998, (USSG Manual effective November 1,

1997) since it is potentially more beneficial to the defendant than the current Sentencing Guideline Manual. The probation officer is in agreement with this position.

The Government and Mr. Bennett also stipulated, and the probation officer agrees, that Mr. Bennett's offense level under the Sentencing Guidelines should be determined by U.S.S.G. § 2T1.9. For determination of the base offense level, § 2T1.9(a)(1) directs the reader to § 2T1.4. Section 2T1.4(a) directs the reader to the Tax Table found in § 2T4.1. Because the employment tax loss that resulted from the offense is approximately $10,500, § 2T4.1(E) yields an offense level of 10 (between $8,000 and $13,500). Two levels are added pursuant to U.S.S.G. § 2T1.4(b)(1), because Mr. Bennett was in the business of preparing or assisting in the preparation of tax returns. This yields a base offense level of 12 under § 2T1.9 (a). Since neither of the specific offense characteristics of § 2T1.9 (b) applies, the total offense level under § 2T1.9 is 12.

The probation officer concurs with the Government's recommendation that two levels should be subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, yielding a total offense level of 10. The probation officer also agrees that no other offense level adjustments are warranted under any other specific offense characteristics or Chapter Three adjustments. (The Commentary to § 2T1.4 specifically provides that since Mr. Bennett has received a two-level enhancement under § 2T1.4(b)(1)(B), there is no enhancement for use of special skill or abuse of position of trust). Since Mr. Bennett has no criminal history, he falls under Criminal History Category I.

With offense level 10 and Criminal History Category I, the resulting guideline range under the Sentencing Table is 6-12 months. Because the intersection of offense level 10 and

Criminal History Category I is within Zone B, the Court, without a departure from the guidelines, may sentence Mr. Bennett to probation with a condition of home confinement for six months. *See* U.S.S.G. § 5B1.1(a)(2) and U.S.S.G. § 5C1.1(c)(3).  Under § 5E1.2(c)(3), the resulting guideline fine range is $2,000 to $20,000.

      B.    Downward Departures

    The Government has moved for a downward departure for Mr. Bennett pursuant to Section 5K1.1 of the Guidelines based on his substantial assistance to the Government in its investigation and prosecution of Claywell.  In addition, Mr. Bennett respectfully submits that this Court should depart downward on the bases enumerated below.  Mr. Bennett respectfully submits that a substantial downward departure is warranted under all of the facts and circumstances of this case.

    As this Court is well aware, the Sentencing Guidelines provide for departures below the applicable guidelines range where the Court "finds a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. §3553(b); U.S.S.G. §5K2.0.  Indeed, the Supreme Court has emphasized that our judicial tradition requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate ... the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996).

    "Exercise of the departure power in appropriate circumstances is an essential ingredient of the sentencing system." *United States v. Merritt*, 988 F.2d 1298, 1306 (2d Cir.), *cert. denied,* 508 U.S. 961 (1993). "The authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoe-horned into a Guidelines range that is formulated only for typical

cases." *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir. 1992). Therefore, "[t]he District Court not only can, but must, consider ... a departure when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest'." *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (emphasis added).

"Unless departure is expressly forbidden by statute or Guidelines, *see, e.g.* USSG §§ 5H1.4, p.s., 5H1.10, p.s., it may be considered in any circumstances not adequately taken into account ... by the [Sentencing] Commission." *United States v. Cruz*, 125 F.3d 74, 79 (2d Cir. 1997). The Second Circuit encourages sentencing judges to consider all possible bases for departures. *United States v. Core*, 125 F.3d 74, 79 (2d Cir. 1997). Even a "discouraged factor" (such as family ties and responsibilities, U.S.S.G. §5H1.6) may justify a downward departure so long as that factor alone or in combination with others "makes the case different from the ordinary case." *Koon v. United States*, 116 S. Ct. at 2050. Furthermore, the Court may "downwardly depart when a number of factors, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the guidelines'." *United States v. Rioux*, 97 F. 3d 648, 663 (2d Cir. 1996) (*quoting* U.S.S.G. §5K2.0 cmt.).

1.    Substantial Assistance to the Government

The Government has filed a motion with the Court for a downward departure from the guideline range based upon the defendant's substantial assistance to the Government in the investigation and prosecution Claywell. In the context of all of the circumstances, the defendant respectfully submits that a substantial downward departure is warranted on this basis.

In its 5K1.1 motion, the Government describes Mr. Bennett's assistance as "extremely valuable." *Government's Sentencing Memorandum And Memorandum Of Law In Support Of Motion For Downward Departure*, at 5. While Mr. Bennett did not have contemporaneous knowledge of Claywell's use of corporate monies for personal expenses, Claywell had put Mr. Bennett in a position to provide that information to the Government. *See Government's Sentencing Memorandum*, at 5. Mr. Bennett did so, permitting the Government "to identify numerous personal expenses paid out of Claywell's corporate funds, and to issue numerous grand jury subpoenas in an effort to corroborate the personal nature of these expenses." *Id*. Mr. Bennett also provided information to the Government about "how Claywell manipulated his periodic 'work-in-progress' reports to deceive his bonding company and to evade taxes." *Id*. at 6.

The Government's motion and memorandum further reflect that Mr. Bennett's cooperation was one of the factors that convinced "Kurt Claywell to enter a guilty plea pursuant to a plea agreement" to a *Klein* conspiracy, in which that "plea agreement between Claywell and the United States contained a full stipulation of his sentencing guidelines, with no disputed issues regarding base offense level or enhancements." *Id*. at 6. Thus, Mr. Bennett's cooperation had a significant impact in bringing about the prosecution of Claywell, who was sentenced by United States District Judge Stefan R. Underhill to a sixty-six month term of imprisonment, and in having that prosecution conducted in an efficient manner, avoiding substantial investigative time on accounting issues as well as the need for a trial or a contested sentencing hearing.

The Government also found Mr. Bennett's cooperation to have been "complete, truthful and reliable," and to have been rendered in a timely manner. Indeed, the Government notes that

it was "[e]arly in the investigation, shortly after Dempsey began to cooperate," that the Government confronted Bennett regarding the falsified computer printouts during the 1998 audit. As reflected in the Government's memorandum, Mr. Bennett "immediately agreed to cooperate with the Government." Thereafter, Mr. Bennett met with the Government and his counsel on eight occasions, and on additional days without his counsel, in an effort to provide information to the Government and review documentation to assist the Government in evaluation the evidence it had obtained. The Government states that Mr. Bennett "provided significant information before the indictment of Kurt Claywell, all of which was provided at a time that was ultimately useful in obtaining a search warrant, in determining where to direct grand jury subpoenas, and arriving at Claywell's eventual guilty plea." *Id.* at 8.

While it is the Government's role to assess the usefulness and truthfulness of a defendant's cooperation, it is respectfully submitted that Mr. Bennett was an ideal cooperator, who was both truthful and valuable, and more than willing to do whatever the Government needed to assist the Government and make amends for his wrongful conduct. It is respectfully submitted that such cooperation justifies a substantial departure from the guideline range.

(2)    Offense Conduct was Outside the Heartland

The absence of a pecuniary gain and the motive for pecuniary gain places this offense outside the heartland of such tax offenses. *See United States v. Brennick*, 134 F.3d 10, 13-14 (1st Cir. 1998 (discussing "heartland" of tax cases). The defendant respectfully submits that the motivation of Mr. Bennett in this case clearly present a situation "sufficient to take the case out of the Guideline's heartland" of tax offenses. *See Koon*, 518 U.S. at 96. A heartland tax offense is one the offender commits with the motivation of greed and wealth acquisition. *See generally*

*United States v. Livoti*, 196 F.3d 322, 328-29 (2d Cir. 1999) ("heartland" analysis). *See also United States v. Sidhom*, 142 F. Supp. 2d 150, 154-161 (D. Mass. 2001) ("heartland" analysis for money laundering). Greed and profit were not Mr. Bennett's motivation. Mr. Bennett did not derive financial gain from his wrongful conduct. Any financial benefit from that conduct was retained by Claywell.

       (3)    <u>Exceptional Acceptance of Responsibility</u>

       The Court has the authority to depart downward for exceptional acceptance of responsibility. *United States v. Rogers*, 972 F.2d 489 (2d Cir. 1992). In this case, Mr. Bennett responded immediately to the Government's contact, fully cooperated with the Government investigation, resolved immediately to plead guilty to a felony in connection with his cooperation with the Government, and has rehabilitated himself, through therapy and otherwise, to the greatest extent possible prior to sentencing. It is respectfully submitted that, under these circumstances, the Court has the authority to depart downward on this basis.

       (4)    <u>Extraordinary Rehabilitation Prior to Imposition of Sentence</u>

       A departure for extraordinary rehabilitation is permissible under the sentencing guidelines. *United States v. Core*, 125 F. 3d 74, 79 (2d Cir. 1997). Years have gone buy since the offense conduct. As the Government's Sentencing memorandum reflects, when Mr. Bennett was approached by the Government, his reaction was to acknowledge his wrongdoing, decide to plead guilty and to cooperate fully in the Government's investigation. Further, in this period before incarceration, Mr. Bennett had dealt in therapy with the core issues that created his vulnerability to a person like Claywell. It is respectfully submitted that, taking this step, so that

he would experience the personal growth necessary to understand, acknowledge and deal with his issues related to the death of his father, is extraordinary rehabilitation.

      (5)    <u>Offense Conduct was Aberrant Behavior</u>

The Second Circuit in *Zecevic v. United States Parole Commission*, 163 F.2d 731, (2d Cir 1998), adopted a totality of the circumstances test to a departure for aberrant behavior. Under the *Zecevic* test, the Court should consider the following:

> In assessing a defendant's behavior, courts may consider factors such as (1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant, including any psychological disorders from which he may have been suffering, at the time of the offense; (5) the defendant's motivations for committing the crime, including any pecuniary gain he derived therefrom; and (6) his efforts to mitigate the effects of the crime. This list is not exclusive, and no one factor shall be dispositive.

163 F.2d at 736. The Court also noted that courts that have adopted the totality of the circumstances test have also considered:

> mitigating factors such as the level of pecuniary gain the defendant derives from the offense; the defendant's charitable activities and prior good deeds; and his efforts to mitigate the effects of the crime, as well as the defendant's employment history and economic support of his family. Whereas the courts applying the spontaneity test define aberrant behavior with reference to the particular crime committed, those employing the totality test look at the criminal conduct in the context of the defendant's day-to-day life. Under the totality test, "when all is said and done, the conduct in question must truly be a short-lived departure from an otherwise law-abiding life." 163 F.2d at 735(citations omitted).

In the instant case, the offense of conviction was aberrant behavior for Mr. Bennett, in that it represents a marked deviation from an otherwise law-abiding life. Among other things, Mr. Bennett had no criminal record, he acted without a motive for pecuniary gain and derived no pecuniary gain, he undertook significant efforts to mitigate the effects of his crime, he has had an

excellent employment history both before and after the offense as well as an excellent history of

supporting his family both before and after the offense. It is respectfully submitted that,

considering the totality of the circumstances, it is within the Court's discretion to depart based

upon aberrant behavior.1

  (6)    Extraordinary Family Circumstances

Although family circumstances fall into the category of "discouraged" bases for

departure, U.S.S.G. § 5H1.6, "[e]xtraordinary family circumstances are widely accepted as a

valid reason" to depart. *United States v. Johnson*, 964 F. 2d 124, 129 (2d Cir. 1992). In fact, the

Second Circuit has shown considerable deference to sentencing court's findings concerning when

a defendant's family circumstances warrant even large departures eliminating prison time. In

*United States v. Galante*, 111 F. 3d 1029, 1037 (2d Cir. 1997), the Court affirmed a 13-level

departure which "avoided putting the families on public assistance and spared traumatizing the

vulnerable emotions of the defendants' children." *See also United States v. Alba*, 933 F. 2d 1117

(2d Cir. 1991); *United States v. Lahey*, 186 F.3d 272, 275 (2d Cir. 1999); *United States v.*

*Walker*, 191 F.3d 326, 338 (2d Cir. 1999). In the instant case, it is respectfully submitted that

a departure is warranted, where the impact that incarceration would have on Mr. Bennett's family

would be devastating, since he is the sole source of income, and his absence from the home

would create a significant burden on Mrs. Bennett in terms of caring for the family in general,

and caring for their son's chronic asthma condition in particular.

---

1 While the Sentencing Commission in 2000 adopted 5K2.0, *see United States v. Castellanos*, 355 F.3d 56 (2d Cir. 2003), and the Court has previously found that 5K2.0 was clarifying rather than a substantive change, *United States v. Gonzales*, 281 F.2d 38, 45-47 (2d Cir. 2002), the one-book rule of 1B1.11(b)(2) would preclude the use of 5K2.0 in the instant case.

(7)    <u>Incarceration Would Adverse Impact the Employees of Bennett & Co.</u>

The Court in *United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995), recognized the authority of the Court to downwardly depart based on the adverse impact that incarceration would have on a defendant's business and the persons it employed.  In this case, pleading and cooperating with the Government, Mr. Bennett's old business ended and he began Bennett & Co. For the past few years, Mr. Bennett has made Bennett & Co a viable business to the point where it now supports six persons, including Mr. Bennett.  It is highly likely that Bennett & Co would not survive as a business if Mr. Bennett is to be incarcerated.  The demise of Bennett & Co. would result in these five other persons losing their livelihoods as well.  It is respectfully submitted that these circumstances warrant a downward departure under *Milikowsky*.

(8)    <u>Mr. Bennett's Physical Condition Would Worsen if Incarcerated</u>

As noted above, Mr. Bennett has had for most of his life ankylosing spondolitus, an arthritis-like condition in joints that is marked by fusing of joints.  This condition has worsened in the last few years.  Currently, Mr. Bennett has to give himself a weekly injection of Enbrel (etanercept).  Due to his condition, Mr. Bennett physician has required Mr. Bennett to sleep on a specific (and expensive) bed.  He also eats a diet specifically designed to forestall the worsening of his condition.  Mr. Bennett is also required to be as active as possible and engage in stretching exercises so that the fusing of the joints does not occur and the amount of his chronic pain is limited.  It is respectfully submitted that incarceration would have a negative impact on Mr. Bennett's physical condition, and that these circumstances also permit the Court to downwardly depart.  *See United States v. Rioux*, 97 F. 3d 648 (2d Cir. 1996).

16

(9)    <u>Combination of Factors</u>

The defendant respectfully submits, based on the circumstances enumerated above, that there exists under 5K2.0, a combination of characteristics and circumstances, even if the Court determines that none of them are individually sufficient, such that the combination thereof takes the case out of the heartland and warrants a downward departure.  When considered together, the number and variety of extraordinary circumstances present in this case presents a situation "sufficient to take the case out of the Guideline's heartland."  *See Koon*, 518 U.S. at 96.  This is so even if this Court were to determine that no one of the factors present here would, alone, render the case extraordinary.  *See United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("[D]istrict court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that 'differs significantly from the "heartland" cases covered by the Guidelines.'") (citation omitted); *see also United States v. Caruso*, 814 F. Supp. 382, 384 (S.D.N.Y. 1993) ("[A]lthough the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law might not individually justify departure, the totality of these circumstances represent ground for downward departure here, where, 'several characteristics, in combination, were not adequately taken into account by the Sentencing Commission in formulating the guidelines.'") (quotations and citations omitted).

While it is respectfully submitted that any one of the factors enumerated above should itself provide sufficient grounds for the Court to fashion an appropriate downward departure, in combination they provide more than ample basis for this Court to grant Mr. Bennett a downward departure.

17

V.    IMPOSITION OF SENTENCE UNDER 3553(a)

Under the Supreme Court ruling in *United States v. Booker*, __ U.S. __, 125 S. Ct. 11 (2004) and *United States v. Fanfan*, __ U.S. __, 125 S. Ct. 12 (2004), the sentencing guidelines have taken on an advisory role. Yet, even under the sentencing guidelines, and without a departure from those guidelines, the Court may sentence Mr. Bennett to a term of probation with six months of home confinement. To effectuate the policy of rewarding those who choose to provide substantial assistance, as well as the Government's motion asking that that Court impose a sentence below Mr. Bennett's applicable guideline range, it is respectfully submitted that it would be appropriate to impose a sentence of probation without home confinement, coupled with service to the community. It is also respectfully submitted that the bases discussed above for a downward departure provide further justification for a sentence of probation that does not include a term of home confinement. As reflected above, Mr. Bennett's case is indeed outside the heartland and is a case where the court has ample authority to sentence Mr. Bennett to probation without home confinement. The defendant respectfully requests that the Court impose such a sentence in this case.

The central command of 18 U.S.C. 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" enumerated in that section. It is respectfully submitted, particularly in view of Mr. Bennett's substantial cooperation with the Government against a significant economic repeat offender as well as Mr. Bennett's absence of motive for pecuniary gain, that a sentence of probation without home confinement,

coupled with community service, is sufficient but not greater than necessary to satisfy the purposes of the imposition of sentence in this case.

Part of what 3553(a) directs the Court to consider is "the history and characteristics of the defendant." Toward that end, and in addition to the information contained in the Presentence Report and in this Memorandum, letters from different people with different perspective of Roger Bennett are attached for the Court's consideration. The letter from Roger's mother focuses on Roger's sense of responsibility and the sacrifices that Roger made for her, particularly after the death of Roger's father. The letter from Roger's sister Lisa also speaks to Roger's sense of responsibility and his sacrifices, but also gives some insight into Roger Bennett's emotional makeup and the emotional state in which Roger grew up. Lisa also speaks eloquently about the punishment that Roger has already experienced for his offense -- punishment inflicted by himself on himself. Lisa also alludes to the pain that Roger has caused his family, and how he wishes in vain that he could take that pain from his wife and family members and endure it himself. Lisa's letter shows so well that Roger is extremely remorseful and very embarrassed by his conduct.

The letter from family friend Julie Saffir also focuses on the remorse that Roger feels over his conduct. But this letter also reflects that Roger's actions with Claywell were, for Roger, an aberration. The letter further reflects that Roger has taken the steps necessary to understanding how and why Roger committed this offense:

> He made a very bad choice in his actions with this client which we have talked about. I know he didn't do it for personal gain. I know Roger has been looking deeply into how and why it happened. This is important to me. I know we all make mistakes and I believe what is important is that we learn from them in talking to Roger about what happened I can see how he is learning important things about himself ...

19

Ms. Saffir is speaking of a man who, since the time of the offense, has taken the significant rehabilitative steps to recognize what it was within him that drew him to Claywell in such a way as to override his judgment of what he knew of right and wrong. It is respectfully submitted that this is the picture of a man who will not commit further crimes. There is no need for further measures to ensure that Mr. Bennett does not repeat his offense.

The letter of Donald Milbier, reflecting that Roger warned him about doing business with and unethical individual whom Roger fired as a client, also indicates that Roger's actions with Claywell were an aberration. This speaks well of both Mr. Bennett's history and character. *See* 3553(a)(1). The letter of Mr. Milbier, further speaks to the generosity and understanding possessed by Mr. Bennett, and his kindness to others. The letter of Edward Hobacia also speaks to the size of Roger's heart. In short, these letters reflect a good person, willing to give of himself to help those around him.

The letter of Mr. Milbier, and of others closest to him, also clearly show that Roger Bennett is a man devoted to his family – to his three children and his wife. Roger supports them financially, but as reflected in Mr. Milbier's letter, they support each other emotionally and spiritually. It is respectfully submitted that serving the purposes of sentencing, and imposing a sentence sufficient, but not greater than necessary, to comply with these purposes, does not in this case call for a sentence that would remove Mr. Bennett from his family. Further, to effectuate the policy of rewarding substantial assistance to the Government, Mr. Bennett most respectfully requests that the Court impose a sentence of probation without home confinement, so that Mr. Bennett can continue to be an active contributor to his family, his town and to society in general.

Respectfully submitted,

THE DEFENDANT
ROGER BENNETT

Stephen V. Manning
O'BRIEN, TANSKI & YOUNG, LLP
CityPlace II
185 Asylum Street
Hartford, Connecticut 06103
(860) 525-2700
svm@otylaw.com
FEDERAL BAR NUMBER ct07224


## CERTIFICATE OF SERVICE

This is to certify that a copy of the within and foregoing was mailed, postage prepaid, this

29th day of August, 2005, to:


William J. Nardini
Assistant United States Attorney
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 773-2108


Mr. Raymond Lopez
United States Probation Officer
United States Probation Office
915 Lafayette Boulevard, Room 200
Bridgeport, CT 06604

Stephen V. Manning
O'BRIEN, TANSKI & YOUNG, LLP

Honorable Janet C. Hall
915 Lafayette Blvd.
Bridgeport, CT06604

Your Honor,

I am one of those parents who never, ever, thought
I would be in this position.    Roger has always
worked extremely hard to meet whatever he
considered to be his responsibilities.  When he was
in grade school, he had a paper route.  When he was
in high school, he bagged groceries at the local
supermarket after school and during vacations.
Since I was widowed at the age of 44, he has always
shown concern for me and helped me to piece
together enough money to support myself.  He was a
National Honor student in high school.  When he
began to look around at colleges, he expressed
interest in becoming an attorney, but because we
did not have the money, he attended UMASS, and
became an accountant.  During summer vacations he
worked at Shop-Rite supermarket.  After graduation,
he lived at home with me, while he was employed in
the accounting department of the corporate office
of Shop-Rite in East Hartford.  Finally, he moved
to Connecticut, where he went to work at Rosen,
Lassoff & Flaster.

Roger lost his father when he was 16 years of age.
Even at that age, I think he felt a certain amount
of responsibility for me.  He earned enough money
to buy his first car and helped taking care of his
own needs while he was living with me.

He now has a family with three beautiful children
who rely on him, as does his wife.  He coaches his
daughter's basketball team.  He does a great share
of the household chores as well as taking the

children to their lessons and putting them to bed.
I am probably guilty of relying too much on him,
but he is my son. Roger always emphasizes
practicality, honesty and living within one's
means, which is what makes this situation so out of
character for him.

I suppose it is every parents' wish to shield their
children from harm, and if I could take his place,
I would.   He has always been considerate and
generous with his family and adds greatly to my
support, both financially and emotionally.   I know
that when Roger goes to court, he will not be the
only person serving his sentence.

Very truly yours,

Evelyn R. Bennett

August 23, 2005

Honorable Janet C. Hall
915 Lafayette Blvd.
Bridgeport, CT06604

 Dear Judge Hall:

I am certain that you have had before you people who have worked in the field of
criminal justice, but never thought that they would be in the position of asking for your
consideration.  As such, I write this letter on behalf of my brother, Roger Bennett, to ask
that you take whatever information I may add into consideration in your sentencing
decision.

I am three years older than Roger, and he is my only sibling. I was the first in our family
to attend college, and being a person who identified greatly with the ideals that were
prevalent in the 60's, I did not view my undergraduate college years in a practical
manner.  Roger, on the other hand, did not argue when our parents made the decision
for him, when he was in high school, to be an accountant because they did not have the
financial resources to send him to law school.  Additionally, he attended a state school,
while I attended a private university and studied medieval English literature.
Subsequently, I recently returned to school and obtained a Masters degree in criminal
justice from SUNY-Albany.  I have worked in the field of alternatives to incarceration and
sentencing mitigation for over twenty years.

During the mid eighties to early 1990, Roger and I lived in close proximity, and we talked
daily about the business that I was setting up; me asking his advice as well as specific
questions about how to handle financial matters.  Because Roger had become a CPA,
he had what I perceived as valuable, practical information; it never occurred to me that
he had no one to ask the kind of questions that I was asking of him, or to rely on
someone in the way that I relied upon him.

It concerned me that Roger did not seem to vent his feelings very often or very openly,
and I would attempt to talk with him about it.  He downplayed that, as he did most things.
Even when he informed our family of this specific legal situation, he broached the
subject very casually, and knowing how easy it is to upset our mother, explained what
would likely happen to him in very optimistic terms.  Little by little, I made myself aware
of the very serious nature of the offense.  Roger did not ask me to write this letter, not
did he ask our mother to write one.  That, for better of worse, is not in his nature.

Currently, Roger has tremendous responsibility as the sole support of a wife and family
with three children; ages 14, 12 and 8.  He works an average of 60-70 hours per week,
as well as maintaining many of the tasks relating to his children.  Our mother also still
relies upon him financially, as she is in her late seventies, and when our father died
suddenly at the age of 55, she was widowed at 44 years, and has never remarried.

I know that my brother suffered for the lack of an adult male role model; he had no way
to learn to become independent and strong, yet emotionally available and approachable.
One of the traits that our father possessed was the ability to appear calm and seemingly
strong in emotional situations.  It was only as an adult did I realize how damaging it was
to have a parent who did not express his feelings toward his children, and upon that

realization, that the apparent calm and strength were impenetrable as a shield to conveying other emotions. I have always worried that Roger possesses this trait and will be at risk for the early death that claimed our father.

I am very concerned about Roger's involvement in this offense, as well as the repercussions to his future. To say that he is remorseful is an understatement. As is often the case with him, if he could bear this responsibility completely on his own, he would. If the consequences to our family and his family could be suffered by only him, he would have it that way. However, we all live in a society where the actions of one person affects other people.

I realize that the federal system attempts to make punishment proportionate to the offense. As I am certain that Your Honor is aware, it is also proportionate to the individual. During the pendancy of the hearing, we have all lived with the uncertainty of the outcome. The personal embarrassment and self-recrimination that Roger has endured have served as their own punishment. He lost his business partner, who was his best friend, because he was counseled that staying with Roger might cause some clients to leave. Roger was extremely hurt, but as with most things, he knew what he had to do, and began his own accounting business. I have never witnessed my brother admit to embarrassment in the ways that he has regarding his involvement in this offense. He has made a mistake and it is my hope that the Court will allow him to repay society by remaining in the community, repaying the community with service, continuing in his business, and raising his family.

Sincerely,

Lisa S. Bennett
2 Prospect Court
Hamden, CT 06517
203.498.7465

December 31, 2004

To Whom It May Concern:

I first met Roger and his wife Barbara eleven years ago when they were pregnant with their second child. Barbara and I became close friends, and as a result I have gotten to know Roger quite intimately. Roger is an incredibly caring husband and father. He is a CPA who works long, hard hours, but I remember many times over the years when Barbara and I would want to attend a particular event, and Roger, even during the work week, would volunteer to watch not only his three kids but my daughter, Robin also. I remember being struck, when we could not find a babysitter, that he cared so much about his wife getting a break that he would actually lose office hours to help us.

Speaking of my daughter, Robin tends to be very introverted and sedentary. My husband and I can rarely get her to participate in physical activity. However, there have been many times on weekends that Roger has taken his children and Robin to hit tennis balls or go "mall jogging". Somehow, Roger gets Robin to participate. She often comes home raving about what great times she has had. I have noticed that children seem to love being with Roger.

I find Roger to be a sensitive man who spends much more time working on himself than most men I know. As a Marriage and Family therapist, I am often in tune with this sort of thing. When we go out as couples, I find that Roger and I spend a good time talking. I am often impressed with his insight.

January 2, 2005

When I heard about Roger's legal situation, I was heart-struck. Eleven years of history tells me that this is an aberration for Roger, based on his relationship with this particular client. Roger slipped into awfully bad judgement. I know Roger as a thoughtful, compassionate person of integrity. He made a very bad choice in his actions with this client which we have talked about. I know he didn't do it for personal gain. I know Roger is remorseful and more importantly I know that Roger has been looking deeply into how and why it happened. This is important to me. I know we all make mistakes and I believe what is important is whether we learn from them. In talking to Roger about what happened I can see how he is learning important things about himself that will help him continue his personal and spiritual growth. This whole affair has been devastating to him and his wife Barbara. Roger's willingness to take responsibility and learn from this, along with Barbara's faith in him have kept them on solid footing.

Sincerely,

Julie B. Saffir, LMFT

Don Milbier
9 Maplewood Ave
Bloomfield, Ct. 06002


January 6, 2005

To Whom It May Concern:


I have been a client of Roger Bennett's for many years, but consider him more than just my CPA. A mutual business associate introduced him to me about 12 years ago when I was in need of a CPA. My business was just coming out of a bankruptcy, partially caused by a lack of attention to my business due to the illness and eventual death of my father. It was a rough period for me, both financially and emotionally. Roger was always there for me during a period when a lot of friends and business associates turned their back on me. I could always count on Roger for business advice or just someone to talk to. An interesting sidelight is that the mutual business associate that introduced us turned out to be unethical in his business practices. As soon as Roger became aware of this fact, he not only warned me not to do business with him, but he also fired him as a client.

Over the years since then, my business has had several ups and downs. I am currently in one of those down periods and am barely keeping my head above water. I have more than once, during these down periods, gone a year or year and one-half without paying Roger's invoices due to cash flow problems. During those periods, Roger has never pushed me for payment showing compassion for my financial predicaments. Also, while his former business partner advised him against continuing to perform additional work for me until he was paid, Roger not only continued to service me, but he prioritized my work during tax season to appease my lenders. I am pleased that he has had the same faith and trust in me that I have always had for him.

Needless to say, I am very saddened to hear about the legal predicament he is now in. I have always known Roger to be of the highest integrity in all of my dealings with him. I was also fortunate to have been invited with my daughter, while my wife was out of town, to a religious dinner at Roger's home. The Bennett's have a close family friend, who is a Rabbi, who led the service. The warmth of that evening and the sense of family exhibited at the dinner were wonderful to be a part of. My life has been completely devoted to my wife and four children and everything I do is for them. I think that part of the reason I relate to Roger Bennett so well is that he lives his life in that same way with a strong sense of family. Roger is a good man with integrity, strong business ethics, and someone I am proud to call my friend.

Sincerely,

Donald Milbier Jr.

December 31, 2004

To whom it may concern:

I met Roger at the University of Massachusetts in the fall of 1974. The circumstances were as follows:

I was living with my brother on the same floor as Roger. We lived on an all male high rise dormitory. After only a month, my brother decided to move in with his girlfriend at the time. I was now a freshman with a "single". The upperclassmen, who would intimidate us freshman, discovered I had a single room. They planned to have a meeting to see who would take over my single, leaving me with their upperclassman roommate in their room. Most freshman would not have minded this, however, I was very uneasy. I had seen Roger around on the floor, and started talking to him. He was the first friendly face around campus, as well as being someone with whom I could relate, for instance, we both came from the Springfield area. I decided to seek Roger's advice regarding my room situation. Most guys our age would not have cared about the menial troubles of a freshman seeking a new roommate, but he listened to me. After a lot of discussion, he threw out this name, "John". I listened to him and John actually turned out to be a wonderful roommate. In fact, Roger and his roommate, John, and myself became pretty inseparable throughout our college years. Roger's kindness literally made the difference in how I viewed my times in college.

Since we are both from the same area, our friendship continued out of college. I have had the privilege of remaining friends with the same boys I met in Elementary School. I began introducing Roger to my friends here in Springfield at our softball games. It wasn't long before he became a part of "our crew". Never before had someone outside our "original circle" make their way in, however, I know my friends could see what I know to be true. Roger is a quality person. He is kind and patient and understanding, as well as being fun, but his best quality would have to be loyalty. He would never turn his back on any one of us, and that is an amazing quality to possess.

As life moved on, we both got married. Roger moved from Springfield to West Hartford, where he started his accounting career. Though we do not see each other as frequently, we do still stay in touch via phone calls, in particular, on birthdays. We also always manage to find a few times in the year to get together, perhaps in a few years this number could increase, but for now I know Roger devotes a large amount of time to his children. I did, as well, however, my children are grown now.

Even though time and distance have affected our relationship's consistency, Roger was the first person I thought to turn to when my wife decided to open up her own cleaning business. We had a million questions regarding every possible concern with running a business. Though the business is not large, and a lot of my wife's questions became redundant, Roger always made the time for us, and our appreciation for the help he provided to us is immeasurable.

The point I truly want to make from all of this is that when we are young, we make our friends based upon the kind of people we find them to be— not because of how they can benefit

us. I have known Roger for thirty years now. He has become successful. More successful than me. But he is still so grounded. He is still the same guy— from the guy who can help guide my wife in managing her small business to the guy who can help me with a trivial room change, and through it all, treat us and our issues as importantly as we view them with as much care and respect as we need and desire. I know that there is good and bad throughout every walk of life, regardless of race, sex, religion, social status, etc., and I mean no offense when I state my final thought, but I have come to think of Roger as a white collar worker with a blue collar heart.

Thank you,

*Edward F. Hobaica*

Edward F. Hobaica     12/31/04

To Whom This Concerns:


     I am writing this letter in support of my friend and neighbor, Roger Bennett. Since Roger and his lovely family moved into the neighborhood two years ago, I have had only good experiences in my associations and conversations with Roger. I have found Roger to be an intelligent, thoughtful, kind person, who has consistently devoted himself to his three young children. In the two years that I have know and lived across the street from Roger, we have had many good conversations, mostly regarding family, movies, sports, and spiritual and issues of philosophy. Roger has always been considerate and kind, to me as well as my own three children. He is an asset to the neighborhood and town, and I enjoy his friendship and company.

                Very truly yours,

                Mitchell Rosin
                92 High Wood Road
                West Hartford, CT

**6 Trumbull Lane**
**West Hartford, Connecticut  06117**

December 10, 2004


RE:  Personal reference for Roger Bennett


To Whom It May Concern:

We have known Roger Bennett both personally and professionally for more than 13 years.

He has advised us on income taxes, small business development, and investment matters.  He has always been thorough, knowledgeable, and well studied.  Over the years, we have referred to him many friends and relatives that have been more than satisfied with his professional services.  He has an excellent reputation in the local community and is sought after by many for his advice.

We also know him to be a dedicated husband, father, and friend with a great sense of humor.  Our children have shared many activities together, many of which Roger orchestrated personally or coached. We have always found him to be compassionate, kind and loyal.

Very Truly Yours,

Michele A. LeConche

David A. Krulee, M.D.